## UNITED STATES v. MAYFIELD.
### No. 746.

Circuit Court of Appeals, Tenth Circuit.
April 5, 1933.

Lawrence A. Lawlor, of Washington, D. C. (Herbert K. Hyde, U. S. Atty., and Fred A. Wagoner, Asst. U. S. Atty., both of Oklahoma City, Okl., and Davis G. Arnold and C. L. Dawson, both of Washington, D. C., Attys., Veterans' Administration, on the brief), for the United States.

A. G. C. Bierer, Jr., of Guthrie, Okl. (A. G. C. Bierer, of Guthrie, Okl., on the brief), for appellee.

Before LEWIS, PHILLIPS, and McDERMOTT, Circuit Judges.

LEWIS, Circuit Judge.

This is an appeal from a judgment in favor of Mayfield on a war risk insurance policy which was kept in force by payment of premiums until July 1, 1918. The trial was without jury, and at the close of the evidence each party moved for findings and judgment. The court ruled in favor of plaintiff and found that the soldier was totally and permanently disabled at the time of his discharge on May 16, 1918,—that is, "said impairment of body rendered it impossible for him to follow continuously any substantially gainful occupation. * * * *"

■ About March 1, 1918, he accidentally shot himself in his left foot. In August, 1918, his foot was amputated above the ankle, and in 1926 a second amputation was believed advisable which was made below the knee. He testified that before enlistment on July 10, 1916, he had done farm work and common labor; that he was discharged from military service May 16, 1918; that the first work he did after the first amputation was shoe repairing; he bought a shop from a German in Mangum and a set of hand tools, and operated there for about six months, and then moved part of the same shop to Burkburnett, and operated it there for about three months; that he was not able to make a living and sold the shop to his brother; that the first farm work he did after his discharge was shocking wheat in 1919, which took about thirty days; that during the fall of that year he picked cotton; his wife's children assisted him; he had married a widow with three children after his discharge; in 1920 he rented a farm of 160

acres and stayed there during that year, planted seventy-five acres of cotton and some milo maize; his wife's boys did part of the plowing, and he helped them; in 1921 he went to "San Antone" with his family, and was there about ten months; that the Red Cross helped him part of the time; while there he worked in a harness shop about eight months as a harness maker; that he had to stand up; he was using a peg leg at that time which he made; that fall he went to Paris, Texas, and picked cotton, and remained there two or three years; while there he did farm work part of the time when he was able to work; he then went back to Oklahoma, near Durant; that during the winter of that year he cut some stove wood; at that time he had his artificial leg; that in March 1923, he received a compensation check for an amount between $2,700 and $2,800; he bought an automobile and ran it himself; he also bought forty acres of land near Silo, Oklahoma; he bought some cows and hogs; in the fall of 1923 he rented a house and two blocks of land in Silo and kept the cows and hogs and chickens he bought, and fed and tended them and sold the cream; he had nine cows and 100 hens, and sold eggs, but he didn't have any luck in raising chickens; in 1924 he took possession of the forty acres, moved over there, and sold the cows because the feed bill was greater than the income; that he couldn't work the crop that year and it was a failure; in 1925 he left the forty acres and went back to Western Oklahoma; that during that summer he didn't do anything; his limb was sore and he couldn't work; in the fall he picked cotton; pulled off his artificial leg and crawled; in 1926 he took vocational training in shoe repairing; when he applied for vocational training he said he was working in a shoe maker's shop, and was making a living, but he testified that he never had made a living; that when he went to take vocational training he was asked if he was satisfied with the work he was then doing, and he answered, "Yes, but I want to learn the trade"; but he testified that they had already told him that he couldn't get anything else and inasmuch as he couldn't get anything else he was willing to take shoe repairing; that the government trained him about twelve months; he started in a shop at Cherokee owned by one Turner; on his way to Mangum he stopped at Gotebo and found a shoe man there who wanted a repair man; he worked there about a month; his limb got sore, and he couldn't hold the job down; he then brought some shoe repairing machinery which he had bought to Gotebo and set up a shop of his own, kept it about a month, and sold it to his brother for $300; that after that he couldn't do anything in 1926; that he had a second operation in August, 1926, and was discharged in the following December; that he took a few jobs of auto top repairing; in 1927 he went to Guthrie, Oklahoma, and has been there since; he first tried to represent the Health Products Company there, selling their goods, but found it was too much walking; that at the time of the trial he had a filling station, a garage, and a tourist camp three miles from Guthrie where he also sells cold drinks; he got that place for his wife's boy to run; there were four tourist cabins; he, his wife, and the boy occupied two of them, and the other two were for the accommodation of tourists.

The complaint seems to be that the end of his leg would not heal over, but he testified that it would at times heal over, and that occurred when he was not trying to do hard work; at times he would let it heal up, and it would get so he could get about again; that using the artificial limb pulls the flesh back from over the end of the stump. It is observed that he worked eight months in a harness shop at San Antonio, had to stand up, and was then using the peg leg. He did not testify that the peg leg pulled the flesh back over the end of the stump. He did say, "I get along better with the artificial than the peg leg." He said that all the work he had done caused the end of the limb to become sore. There was testimony that at times he used crutches.

Not only is it a matter of common knowledge that there are many occupations which men with one leg can successfully follow, but the record contains unchallenged proof of that fact. Dr. Border, a physician and surgeon and a witness for the defendant, testified that in his opinion while a man with one leg is permanently disabled he is not totally disabled; that he had seen men with one leg making a living at various sorts of trades; that he had seen a man with one leg off doing carpenter work; that he could run elevators; that he had seen a man who was then at Mangum with both legs off, who acts as depot agent and walks a half mile back and forth every day; that in his opinion the knee could be properly padded so that the stump wouldn't become sore with the peg leg; that plaintiff could conduct a tourist camp, and follow other occupations.

The shoe repair man whom plaintiff had bought out had lived at Mangum twenty-four years, and had been in the shoe repair business since 1882. He had electrical machinery in his shop. He testified that he had seen lots of men with one leg operate a shoe repair shop with success; that such work does not require standing up all the time; that there was a man with one leg operating and carrying on a shoe repairing business at El Reno; one at Stamford, Texas, with both legs off making a living for his family; one at Wichita Falls, Texas, on crutches who had to sit down to do the work, but was making a living. But as said, this is a matter of common knowledge.

In Hanagan v. United States (C. C. A.) 57 F.(2d) 860, 861, the soldier did not lose his leg, but he was wounded while in the service in the left knee so that his leg, according to the proof, was practically useless. For a considerable time he used crutches and afterwards a cane. At times the leg gave way in walking. His occupation had been that of a miner. The court in affirming the judgment in favor of defendant said:

"Notwithstanding appellant's great service and sacrifice, and the evident permanent injury to his leg, this case involves no matter of sentiment, but only of contract. It can scarcely be denied that there is in the record substantial evidence indicating that this man is capable of undertaking and continuously performing such work as a one-legged man can do, and therefore he was not and is not totally disabled as the contract provides must be the case to warrant recovery upon the certificate."

In United States v. Weeks (C. C. A.) 62 F.(2d) 1030, the plaintiff had judgment which was reversed on appeal. While in the service he was shot four times in his right leg above the ankle. After discharge he did very little work except making a small garden and doing some hoeing. The injured leg was two to two and one-half inches shorter than the other. It was painful to bear weight upon it, and swelling occurred when he used it. His occupation had been farming, and he was not able to farm since his discharge. Three laymen and two doctors testified that he was not able to follow continuously any substantially gainful occupation, and that such condition was permanent. It appears in that opinion that the soldier did far less than the plaintiff in this case has done towards making a living. Of course, the fact that he did less is not a test, but the proof as to what this plaintiff has done during 1919 and since is convincing proof that he was not on July 1, 1918, totally disabled; and because thereof the policy lapsed on July 1, 1918, and was not in force when this suit was instituted.

A physician and surgeon was called by the plaintiff. He testified that he did not think the plaintiff could follow continuously any substantially gainful occupation for which he is qualified on account of his condition, but then he added, "It is not directly his leg; it is his physical condition along with it." On cross-examination he said he had seen men who had lost a leg wear an artificial limb with success and use peg legs with success; that in the use of the peg leg there is no pressure on the exposed bone. But there was no proof of plaintiff's physical condition, aside from his having lost his leg, on July 1, 1918, and the plaintiff did not claim to have any physical ailments.

Obviously, plaintiff is permanently disabled and cannot continuously do the things required in some occupations, but we think it equally plain that there are other and many occupations to which he can continuously apply himself; and we think it also true on undisputed proof that there would be far less and probably no frequent irritation of the limb if he would wear a peg leg that had been properly fitted to the knee.

We think the judgment should be reversed. It is so ordered.