BERRY v. UNITED STATES.

No. 265.

Circuit Court of Appeals, Second Circuit.

April 29, 1940.

Joseph A. McNamara, U. S. Atty., of Burlington, Vt., and Julius C. Martin, Director, Bureau of War Risk Litigation, Wilbur C. Pickett, Sp. Asst. to Atty. Gen., and Keith L. Seegmiller, Atty., Department of Justice, all of Washington, D. C., for appellant.

Ernest W. Gibson, Jr., and F. Elliott Barber, Jr., both of Brattleboro, Vt., for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from a judgment entered upon the verdict of a jury in an action upon a policy of war risk insurance. The only substantial question is whether there was evidence on which a jury might find that the plaintiff was permanently and totally disabled on September 1, 1919. He was a farmer, born in Vermont in 1892, and served in the army in France during the Great War. In June of 1918, while standing guard in the front line, a shell burst close to him and wounded him in several places. He was ordered to a dugout until the shelling stopped, so that he could go back to a "first-aid station", and while waiting there, another shell exploded in front of the door. This killed several of the men in the dug-out, and nearly severed the plaintiff's left leg. He was finally brought to a hospital where the leg was amputated between five and six inches below the knee, and where his other wounds were dressed. He was shipped back home in August and arrived at Boston in September. He was in two hospitals until about Christmas, at which time a temporary artificial leg was given him, on which he could do some walking. After his discharge on January 2, 1919, the stump continued to trouble him; apparently the operation had not been well done, and it was never found possible to furnish him with an artificial leg that would prevent boils and abscesses from breaking out after he had stood upon it for three days or more. The Veteran Administration recognized that he was very heavily handicapped in earning capacity, and offered him vocational training. He had had some acquaintance with photography before he went into the army, and they gave him training in that—not at his own choice, as he said, but at theirs. He finished the course in November, 1919, and in January, 1920, was offered a "retouching job" in Boston. This he gave up after a trial of an hour and a half, giving as the reason that his hand shook too much. A jury might have found that his experiences in the war had unsettled his nervous system so much that he could not do "retouching", but it does not appear that he could not have been successful in other branches of photography which he never tried. Certain it is that he was neurasthenic, and had uncontrollable accesses of terror at any explosion, or even during thunder-storms.

He did no work for about a year, though he made several efforts; his inability being chiefly due to the condition of his leg, which had to be operated upon once more in the spring of 1920. It had measurably healed by July and he did some intermittent work during the rest of that year. In January of 1921, the authorities gave him a new course in vocational training as an automobile or garage mechanic; this was at his own insistence, and against their advice, since the condition of his leg made it unlikely that he could stand for as long as such work required. The "statistical report" of the Veterans' Bureau, which was not effectively discredited, shows that from February, 1921, to April 15, 1923, he was employed more than twenty-six months in all, losing therefore not much more than one. This completed his training, and he worked on his own for about six months more, say till November, 1923, when he abandoned this calling because of his infirmity. A jury might have found that it required more standing than he was capable of, and that he was therefore unfitted for it.

In the spring of 1924 he got possession of a small dairy farm where with his wife he worked from 1924 to 1928. He did some of the work about the place, but she and a hired man did the greater part, and they sold on an average about thirteen dollars a month of milk, cream and butter fat. It does not appear that he did not contribute appreciably to the work. In addition during this period he set up a small garage with one, Orcutt, and later, after he had lost his farm, a second garage in the autumn of 1928, with one, Bishop; both of these had failed by the end of 1929, his explanation for the second being that he could not do enough work himself, or be "around" to keep an eye on the business. From the middle of February, 1930, to the end of that

year, he was a salesman of aluminum cooking utensils. During that period of ten and a half months he sold about $2,200 of these wares at a commission of between thirty and forty per cent; which must have brought him about $700, or at the rate of nearly $70 a month. The only reason he gave for abandoning this business was that "we couldn't put on suppers enough to keep going and keep up our expenses and make a living". The plaintiff and his wife would make "demonstrations" of the utensils by cooking meals at the houses of prospective customers and making a later call to sell. The expense was the food, which they furnished, and the cost of the car, and it does not appear how much these amounted to. The plaintiff did not say that they equalled his commissions, but only that a "living" was not left over. Perhaps not, but it does not appear that the job was not "substantially gainful". During the eight years following 1930, he did odd jobs as a salesman of various wares, as a truckman, and at a filling station. He kept an automobile license all the while. In all he gave the condition of his leg as the reason for his inability to keep to them, but it is not apparent why this should have disabled him in all.

No one can fail to sympathize with the sufferings and broken life of this unhappy victim of war; but the issue is not whether he deserves more than the compensation which he has already received; but whether his case falls within the compass of a contract of insurance; that is, whether his injuries prevented his continuous pursuit of "any substantially gainful occupation". To succeed upon that issue he must show, not only that he was unfitted for his former calling, or for that for which he chose to be trained, but for any other that was open to him. Lumbra v. United States, 290 U.S. 551, 559, 54 S.Ct. 272, 78 L.Ed. 492; Miller v. United States, 294 U.S. 435, 441, 55 S.Ct. 440, 79 L.Ed. 977; Byrne v. United States, 2 Cir., 77 F.2d 829. There was no convincing evidence to justify that conclusion, although a jury might have found that he was unable to do the work of a garage mechanic, or of a "retoucher" of photographs.

Not only did he fail to prove that there were no "gainful occupations" open to him, but the evidence affirmatively proved the contrary. As salesman of aluminum utensils he succeeded in earning gross, in the neighborhood of seventeen dollars a week for nearly a year, and it does not appear that his discontinuance of the business was due to his injury. Furthermore, as we have said, it is not clear that his failure to keep employed for the years after 1930 was because of his leg. In several decisions it was held that the loss of a leg does not completely disable a man, and common experience confirms that conclusion. Hanagan v. United States, 7 Cir., 57 F.2d 860; United States v. Mayfield, 10 Cir., 64 F.2d 214; United States v. Harris, 4 Cir., 66 F.2d 71; United States v. Tarrer, 3 Cir., 77 F. 2d 423. Such unfortunates deserve the most generous consideration from those who have happily escaped their plight; but the example of many of them proves that they are not utterly without earning power. In several of the decisions just cited the amputation had left the stump subject to repeated soreness which interfered with the use of an artificial leg.

Finally, while we cannot properly hold that a delay of thirteen years is conclusive evidence against such a claim, it imposes a heavy burden upon the claimant. Lumbra v. United States, supra, 290 U. S. 551, 560, 561, 54 S.Ct. 272, 78 L.Ed. 492; United States v. Hairston, 8 Cir., 55 F.2d 825, 827; United States v. Fain, 8 Cir., 103 F.2d 161, 164. The plaintiff did not produce that "clear and satisfactory evidence" to excuse his delay without which it is "strong evidence that he was not totally and permanently disabled". All he said was that at the time of his discharge he had been told that he could not sue unless he was so bedridden and helpless that he required an attendant. In 1928, he signed an application for life insurance in which he gave his occupation as "auto mechanic", and declared that he had "lost from work through illness during the last five years" only a few weeks due to an operation for appendicitis. Plainly he did not then regard himself as wholly incapacitated.

Judgment reversed; petition dismissed.