## Peter Theiss *v.* Theo. Weiss, Appellant.

[Marked to be reported.]

*Sale—Breach of contract—Measure of damages.*

In an action to recover damages for a failure to deliver goods which defendant agreed to sell to plaintiff, the measure of damages is the difference between the contract price and the real price at which he obtained the goods to fill the orders intended to have been filled by the goods which defendant agreed to deliver.

In such a case, where plaintiff admits that he obtained most of the goods with which to fill his orders from his own firm, defendant may ask plaintiff what the goods he thus obtained cost him, and whether he made or lost money on the goods he obtained to fill the orders.

Argued Nov. 7, 1894. Appeal, No. 260, Oct. T., 1894, by defendant, from judgment of C. P. No. 2, Allegheny Co., April T., 1893, No. 207, on a verdict for plaintiff. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM, MITCHELL, DEAN and FELL, JJ. Reversed.

Assumpsit to recover damages for failure to deliver flour under contract in writing.

The contract in writing was as follows:

"PITTSBURG, Aug. 4, 1891.

"Mess. Theo. Weiss sold Peter Theiss one hundred cars of straight flour, to be delivered on P. Theiss' order, cars to contain 200 bbls. each car, flour to be equal to Theiss, Kuegle &

Company's flour, to be delivered two cars per day. Pay, sight draft, with bill of lading attached; price to be $4.00 per barrel bulk.      [Signed.]   T. WEISS.
" Witness:  C. MCMASTERS."

The evidence on behalf of defendant tended to show that when defendant signed the paper he was considerably under the influence of liquor, but that he knew perfectly well what he was doing. The parties had been bargaining over the sale of two car loads of flour at $4.35 and $4.45. Finally defendant, as he testified, said to plaintiff: " If you will not sell me flour I will sell you some. I will sell you all the flour you want at $4.00. Theiss, he asked me how much I sell and I said 100 car loads. Theiss says, well he will take the offer. Q. What was done with that understanding. Was it reduced to writing?  A. Yes, sir.   Mr. Theiss told Mr. McMasters to put it down so he not forget it.  Q. And you signed it?  A. Yes, sir. . . . I said it in a bantering way."

When plaintiff was on the stand he was asked by defendant: " Q. You filled these orders of flour which you expected to get from Mr. Weiss with flour which you were obliged to obtain from other sources, you filled this contract from other sources ? A. Yes, sir.  Q. Did you make or lose money on it? " Objected to as incompetent.  By the Court: It is wholly immaterial whether he made money off of the sale or not; he has testified what he sold the flour at, if he did get the flour from the defendant at $4.00, he would have gotten a certain profit, if he had to pay $4.40 to meet his contract, and still made 10 to 15 cents per barrel his actual loss would be more than that in consequence of not getting the flour from the defendant, and therefore this question is irrelevant.  Objection sustained.  Exception and bill sealed. [10]

The same witness was asked by defendant: " Q. Now I ask you what did that flour cost you ? " Objection.  Objection sustained.  Exception and bill sealed. [11]

Defendant offered to prove by this witness the use of intoxicating liquors at the making of this contract, and the character and quantities of liquor used.  Objected to as not cross-examination.  By the Court: This is wholly beyond all proper examination ; it is trying to get into the case now what is evidently a part of the defence.  Objection sustained.  Exception and bill sealed. [12]

The court charged in part as follows:

" [That paper was signed by T. Weiss, and, according to the evidence, handed over to Mr. Theiss, and that made the contract between these two parties. It was not necessary for Mr. Weiss to sign the paper; it was signed by the defendant and handed over to the plaintiff as a contract between them and accepted by the plaintiff, and that made it a contract between the parties and binding upon both. . . .

" The contract was mutual and mutually binding upon both parties responsible under this contract. . . .

" I may here state the rule of damages in a case of this kind: Where there is a contract of this sort to deliver goods, flour or any other commodity in the market, where the vendor fails to complete his contract, fails to deliver goods according to his contract, the purchaser can hold him for the difference between the price he was to pay, and the market price of the same article at the time and place of delivery. Now I believe the letter in evidence would require the flour to be delivered in Pittsburg. Take this then as the place of delivery. The time would be every day after the day of notice to begin shipment, and that would take, say fifty days, that is week days, or very nearly two months altogether, and that would run until the middle of October. Now during that time, from the middle of August to the middle of October, flour fluctuated, sometimes selling at $4.45, sometimes at $4.60, and sometimes at $4.65, and some said at $4.70.

" The regular rule of damages would be, on flour that was to be delivered here, say the first of September, if the price of flour on that date was $4.50, the difference between that and the contract price would be fifty cents a barrel; if at other times the regular market price was sixty cents a barrel, there would be a difference of sixty cents on every barrel, and so if the price was 35, 50, or 15 cents; at any date when the shipment should be delivered, the difference there would be either 15 or 30 cents, and whatever the market price was at that time above $4.00 a barrel.

" Perhaps the better way would be to average, as some of the witnesses have done, and say what would be the average price of flour, from the time this flour should have commenced to be shipped, to the time the shipment should have been completed. . . .

"Now the rule in cases of this kind, is, that where a letter has been written to a party doing business, whose place of business is known, and that letter is properly addressed in name of the party and to the address of the party, and put into the postoffice, the presumption of law is, that the letter has reached the party, . . . . the presumption of law is that he received these letters. . . .

"Now a man may make a bluff or banter, and if the other side takes it up seriously, and they make a contract on that basis it is binding. . . . I repeat what I have to say on that point. If the defendant in a bantering and bluffing spirit proposed to sell the plaintiff the number of barrels of flour, and at the price set forth in this contract, yet if the plaintiff accepts his banter, and the defendant knowing the plaintiff had seriously accepted it, deliberately signed the contract, it is binding upon him; if, however, it was understood by both parties as a mere bluff or banter, then it amounts to nothing. . . .

"It is no defence in this case that the defendant was considerably under the influence of liquor when he signed the contract, provided he clearly understood what he was doing and the nature and effects of the contract he signed, and deliberately signed it. But if the plaintiff either induced the defendant to drink to excess or knowing he was under the influence of liquor got him to sign the contract . . . . it would be such an unfair advantage as to be a fraud upon the defendant and would make the contract null and void. . . . The question is, was he so much under the influence of liquor, if under the influence of liquor at all, that he did not know what he was doing, did not clearly and fully comprehend what he was doing, or was he imposed on? was there any trick practiced by the plaintiff either to get him under the influence of liquor or otherwise to get him to sign the contract? That is a question for you. . . .

"It is for you to say, gentlemen, whether the defendant did not deliberately, knowing what he was doing, sign this contract, and if so, although it commenced in a bluffing, bantering way, yet if it ended in a serious manner, the plaintiff wanting him to put it in writing and sign it, and so understood it, and he deliberately signed it, knowing what he was doing, although he may have been somewhat under the influence of liquor, it would not be a defence in this action.] " [13]

Defendant's points were among others as follows:

1. Request for binding instructions. Refused. [1]

" 2. If the jury believe that the defendant did not possess financial means adequate to carry out this contract, even if it had been entered into in good faith, their verdict must be for the defendant." Refused. [2]

" 3. If the jury believe that this alleged contract was entered into by the defendant as a banter or bluff while influenced by the liquor he drank, and that it was not meant in good faith by him, their verdict must be for the defendant. *Answer:* Refused unless the plaintiff so understood it and in that spirit the contract was signed." [3]

" 4. If the jury believe that the defendant was so far under the influence of liquor, that his reasoning powers and judgment were affected thereby, and that in such condition he signed the alleged contract, their verdict must be for the defendant. *Answer:* This point is too indefinite; if the defendant was so much under the influence of the liquor that he did not clearly understand what he was doing or the nature and effect of the contract he signed, he is not liable in this action." [4]

" 5. If the jury believe that the effect of the intoxicating liquor which the defendant drank was such that, by reason thereof, he signed the contract and made an agreement which he would not have signed or entered into had he not been influenced by the liquor he drank, then the verdict must be for the defendant. *Answer:* This point is nearly the same as the fourth, and the same answer applies to this point." [5]

" 11. If the jury believe that plaintiff did make a demand on the defendant for the fulfillment of the alleged contract, and that defendant at the time of the execution of the contract was sober enough to know what he was doing, then the measure of the damages is the difference between the contract price of the flour and the market price, and the market price to Theiss was the price he actually paid for flour with which to complete this contract, no matter where he procured the flour. *Answer:* The rule as to the measure of damages is the difference between the contract price and the regular market price at the time and place of the delivery, but if the plaintiff bought flour at less than the regular market price, he can recover no more than the difference he had to pay. [6]

" 12. As Theiss has not shown what he actually paid Theiss, Kuegle & Co. for the flour which he expected to get, under the contract, from Weiss, he has set up no measure of damages and cannot recover." Refused. [7]

" 13. If as an individual he bought the flour which he expected to get from Weiss from the firm of Theiss, Kuegle & Co., and Theiss thereby made good his contract, then what he paid said Theiss, Kuegle & Co. was as to him the market price. *Answer :* If the plaintiff actually bought flour from the firm in which he was a member for less than the regular market price, to fill contracts he had made on the faith of the contract with defendant, for the quantity of flour thus bought, plaintiff can recover only the difference between the contract price and the price he actually paid his firm." [8]

" 15. If the jury believe that Weiss undertook to sell what he did not have and could not obtain, and had not the means to obtain to be delivered in the future, without tender for the payment thereof, it was a gambling contract and is void." Refused. [9]

Verdict and judgment for plaintiff for $5,000.

*Errors assigned* were (1–9, 13) instructions; (10–12) rulings; quoting bills of exception and instructions.

*J. J. Miller, John Wilson* with him, for appellant.—The failure to have sufficient means is one of the circumstances a jury may take into consideration in determining the true intent of defendant: Myers v. Tobias, 24 W. N. 432.

This alleged contract was a bluff or banter—it was not meant in good faith at any time by defendant—not even by plaintiff at the time it was made. It was therefore not binding as a contract: Brown v. Finney, 53 Pa., p. 373.

An express contract, entered into when the obligor is in a state of intoxication so as to deprive him of the exercise of his understanding, is voidable even though the intoxication was voluntary and not procured by the circumvention of the other party: 11 A. & E. Ency. L. 773 ; Smith on Contracts, p. 363.

This verdict represents loss of profits, not an actual loss. Compensation in damages is not for a speculative loss, but for an actual one: Lentz v. Choteau, 42 Pa. 435.

If with the market open to him, the vendee is able to, and actually buys under the market price, his actual damage or loss is the difference between the contract price and the price at which he actually bought, for when he has received that difference, he has been compensated: Kountz v. Kirkpatrick, 72 Pa. 376; Forsyth v. Palmer, 14 Pa. 97; McKnight v. Ratcliff, 44 Pa. 169.

A firm in law is a distinct person from the members who compose it: Donnelly v. Ryan, 41 Pa. 306; Clarke v. R. R., 136 Pa. 408. Plaintiff's purchase from his firm was therefore a resort to the market.

In our case, the court's rulings on the admission of evidence were with a view to establish a theoretical measure of damages in a case where it was defendant's effort to establish the actual damages; and when it was perfectly possible to do so: Arnold v. Blabon, 147 Pa. 372; Seely v. Alden, 61 Pa. at page 305.

*Willis F. McCook,* for appellee.—The court, in this case, laid down just what must be, in sales of commodities of this kind, the universal rule of the measure of damages, namely: the difference between the contract and the market price of the commodity sold at the place and time of delivery agreed upon.

Plaintiff was under no duty to give defendant the benefit of his plant and investments and materials for the purpose of mitigating damages. If, as is admitted, the plaintiff used the flour made by him to fill this contract, that flour was worth to plaintiff just what he could have then sold it for in the market. As to him that was the actual damage which he suffered by defendant's failure to perform the contract.

OPINION BY MR. JUSTICE GREEN, Jan. 7, 1895:

The plaintiff testified on the trial, very positively and directly, that he sold all the flour he bought from the defendant, to various firms and individuals immediately after the contract in suit was made. He also said he was obliged to purchase the flour to fill those orders. He was permitted to prove, and did prove, the market price of flour during the time he was making the sales. He admitted however that he got most of the flour with which to fill these orders from his own firm. The defendant asked the plaintiff what the flour he thus obtained cost

him, and whether he made or lost money on the flour he obtained to fill these orders. The court rejected these offers of proof; and the assignments of error to the rejection of the offers, and to what the court below said on the question of the measure of damages, give rise to the question, what is the true measure of damages applicable to the facts of this case. The court charged that it was the difference between the contract price named in the contract in suit, and the market price of the same grade of flour at the time and place of delivery.

There is no doubt that this is the general rule in cases where the vendor of goods refuses to deliver, and no part of the price has been paid. But the defendant contends that the rule is different where the vendee supplies himself with other goods, in order to fill orders which he has taken for the resale of the goods which he contracted to receive from the vendor.

In 2 Benj. on Sales, sec. 1327, the writer says, " It is submitted that these decisions establish the following rules in cases where goods have been bought for the purpose of resale, and there is no market in which the buyer can readily obtain them : 1. If at the time of the sale the existence of a subcontract is made known to the seller, the buyer, on the seller's default in delivering the goods, has two courses open to him : (1) He may elect to fulfill his subcontract, and for that purpose go into the market and purchase the best substitute obtainable, charging the seller with the difference between the contract price of the goods and the price of the goods substituted. (2) He may elect to abandon his subcontract, and in that case he may recover as damages against the seller, his loss of profits on the subsale, and any penalties he may be liable to pay, for breach of his subcontract. . . . If at the time of the sale the existence of a subcontract is not made known to the seller, a knowledge on his part that the buyer is purchasing with the general intention to resell, or notice of the subcontract given to him subsequent to the date of the contract, will not render him liable for the buyer's loss of profits on such subcontract; the buyer may either procure the best substitute for the goods as before, and fulfill his subcontract, charging the seller with the difference in price, or abandon his subcontract and bring his action for damages, when the ordinary rule, it would seem, will apply, and the jury must estimate, as well as they can, the difference between the contract price

and the market value of the goods, although there is no market price in the sense that there is no place where the buyer can readily procure the goods contracted for. In every case the buyer, to entitle him to recover the full amount of damages, must have acted throughout as a reasonable man of business, and done all in his power to mitigate the loss."

In the case of Kountz v. Kirkpatrick, 72 Pa. 376, the opinion delivered by Mr. Justice AGNEW contains a very able and exhaustive discussion of the subject of the measure of damages, in actions by the vendee of goods, against the vendor, where delivery has been refused. The case turned upon the question of the effect of a combination, after the sale, and before delivery, by the buyer with others to put up the price of the commodity sold, oil, the buyer having in the meantime assigned his contract to a stranger. It was held that the assignee was not bound by the acts of his assignor, but nevertheless the rule as to the measure of the seller's liability was shown not to be the current market price.

After stating the general rule that the true measure is the difference between the contract price and the market *value* (not price) at the time and place of delivery, the opinion proceeds: "Ordinarily, when an article of sale is in the market and has a market value, there is no difference between its value and the market price, and the law adopts the latter as the proper evidence of the value. . . . Value and price are, therefore, not synonymous, or the necessary equivalents of each other, though commonly market value and market price are legal equivalents." Citing the rule as stated in Sedgwick on Damages, 4th. ed. 260, that the true measure of damages in such cases is the difference between the contract *price* and the market *value*, and "that this is the plaintiff's real loss, and that, with this sum, he can go into the market and supply himself with the same article from another vendor," the opinion further proceeds, quoting from Smethurst v. Woolston, 5 W. & S. 109, "The *value* of the article at or about the time it is to be delivered, is the measure of damages, in a suit by the vendee against the vendor for a breach of the contract. . . . It is therefore proper to inquire into the true legal idea of damages in order to determine the proper definition of the term value. Except in those cases where oppression, fraud, malice

or negligence enter into the question, 'the declared object (says Mr. Sedgwick in his work on Damages) is to give *compensation* to the party injured for the actual loss sustained,' 4th ed., pp. 28, 29, also pp. 36, 37. Among the many authorities he gives he quotes the language of C. J. SHIPPEN, in Bussey v. Donaldson, 4 Dallas, 206, 'as to the assessment of damages (said he), it is a rational and legal principle, that the compensation should be equivalent to the injury.' 'The rule,' said C. J. GIBSON, 'is to give actual compensation, by graduating the amount of the damages, exactly to the extent of the loss:' Forsyth v. Palmer, 2 Harris, 97. Thus compensation being the true purpose of the law, it is obvious that the means employed, in other words, the evidence to ascertain compensation, must be such as truly reaches this end. It is equally obvious, when we consider its true nature, that, as evidence, the market price of an article is only a means of arriving at compensation; it is not itself the value of the article, but is the evidence of value. The law adopts it as a natural inference of fact, but not as a conclusive legal presumption. . . . But to assert that the price asked in the market is the true and only test of value, is to abandon the proper object of damages, viz., compensation, in all those cases where the market evidently does not afford the true measure of value."

In Seely v. Alden, 61 Pa. 302, we said, " If there be different modes of measuring the damages, depending on the circumstances, the proper way is to hear the evidence, and to instruct the jury afterwards according to the nature of the case."

In Wehle v. Haviland, 69 N. Y. 448, it was held that the " market price " within the meaning of the rule, is the price at which the goods can be replaced, and not their retail value.

In Haskell v. Hunter, 23 Mich. 305, it was held that in an action for the non-delivery of lumber the true measure of damages is the difference between the contract price, and what it would have cost plaintiffs to procure it at the place of delivery, and at the time or times when it was reasonably proper for them to supply themselves with lumber of the kind and quality they were to receive under the contract.

In the case of Arnold v. Blabon, 147 Pa. 372, which was an action by the vendor of a quantity of cork to recover the contract price of cork delivered, the defence was that the plaintiffs

were bound by the contract to deliver a much larger quantity than they did, and refused to deliver the residue, and the defendant claimed that he had been obliged to procure cork to supply the deficiency at a higher price than the contract called for, and asked for a certificate of damages against the plaintiff, the court below charged as follows, " Undoubtedly if you find there was this contract as claimed here by the defendant, and if you find that the plaintiffs broke it, the defendant would have the right then to his damages, which damages are fixed ; but if the defendant was able by any acts on his part to lessen his damage, he could not of course recover more than his actual damage. . . . Then comes the question whether this defendant, in obtaining these goods from other people, did lessen his damages, whether he made them any less than the difference between the price agreed upon in the contract and the market price at the date of the breach. . . . If you find for the plaintiffs you will find for this amount, $151. If, on the other hand, you find for the defendant, you will give him a certificate of the amount that he actually paid out, that is the difference between the alleged contract price and the market value of that amount, 340 tons of cork, on the day of the breach of the contract, unless you find from the evidence that what he bought cost him less than that, in which case you will find for the lesser sum." This ruling was affirmed by this court in a per curiam opinion in which we said we found no error on the part of the court.

And the ruling was manifestly correct, because, while it is true that the ordinary rule of damages in such cases would have entitled the defendant to recover the entire difference between the market value of the cork and the contract price, yet as the proof was that he had supplied himself with cork at a less cost than the market price, he could recover only for his actual loss. This is in accord with all the authorities above cited and is perfectly sound law. The rule of actual compensation for the loss of the goods to be delivered, requires that the actual loss only should be allowed to be recovered.

We are therefore of opinion that the defendant should have been allowed to prove what was the actual cost to the plaintiff of the flour which the plaintiff said he bought from other parties to fill his orders. We sustain the sixth, seventh, tenth, eleventh and thirteenth assignments of error.

We do not feel that we can sustain any of the other assignments.  The case necessarily had to go to the jury on the main questions of the condition of the defendant at the time he signed the contract in suit, and whether it was a mere bantering proposition, never intended to be carried into execution; and the learned court below fairly and correctly left these questions to the jury.  The verdict was against the defendant and after reading carefully the whole of the testimony, we feel constrained to say that we regard the verdict as against the weight of the evidence on this latter question.  The case, in its circumstances, is very much like the case of Brown v. Finney, 53 Pa. 373, which received the condemnation and reversal of this court after a verdict of $2,000 had been recovered in the court below.

The defendant in this case unfortunately and most unwisely put his name to a written proposition, and while it is manifest that he did so while considerably under the influence of liquor, it is very plain that he knew perfectly well what he was doing, and that he was not impelled to affix his signature by any act of fraud, deceit, imposition, mistake or undue influence.  On the contrary his partner, who was present, refused to become a party to such an act of drunken folly, but after that refusal the defendant did consciously and knowingly put his name to the paper, with a recklessness, and a silly disregard of consequences, which no doubt, he has bitterly regretted ever since.

Nevertheless. a calm review of the circumstances indicates clearly, as we think, that the making of the offer to sell 20,000 barrels of flour at four dollars a barrel, at the same time when he actually bought 400 barrels, in good business earnest, at four dollars and forty-five cents a barrel, and the signing of a memorandum in writing of such a sale, was never regarded or intended by either party, as more than a mere bluff or banter without any serious intention that it should be performed as a real, bona fide contract.  It was perfectly evident and was abundantly proved, that the defendant, who was a small retail dealer with limited means, was utterly unable to carry out such a contract, even if the flour could have been obtained in sufficient quantity, and was also unable, without a large advance in the price, to make deliveries at the rate of 400 barrels daily for fifty consecutive days.  There is very grave reason to doubt

the correctness of the plaintiff's statement that he immediately called upon the defendant to perform the contract, in view of the defendant's positive denial, and, what is more important, the continuance of their ordinary business relations and the customary purchases by the defendant from the plaintiff, of flour at the regular market rates which were considerably above four dollars per barrel. One of the witnesses present, and entirely disinterested, testified that he heard and saw the whole transaction, that the defendant's statement to the plaintiff that he would sell him the flour was made in a bantering, joking way, and that his understanding was that the plaintiff regarded it as a joke.

But of course all of these things were matters for the consideration of the jury, and it is out of our power to change the verdict, no matter what we may think of the effect of the testimony. We do not think the court committed error in the instructions given to the jury upon these subjects, and therefore as to all the assignments of error except those which relate to the measure of damages, we dismiss them as not being sustained.

Judgment reversed and new venire awarded.