## WILLIAMS *v.* GREAT SOUTHERN LUMBER COMPANY.

No. 252.   Argued March 1, 2, 1928.—Decided April 16, 1928.

*Messrs. W. J. Waguespack* and *A. F. Higgins,* with whom *Mr. Max M. Schaumburger* was on the brief, for petitioner.

*Mr. H. Genéres Dufour*, with whom *Messrs. B. M. Miller* and *Delos R. Johnson* were on the brief, for respondent.

MR. JUSTICE SANFORD delivered the opinion of the Court.

This suit was brought in the federal court for eastern Louisiana by Lena A. Williams, widow of L. E. Williams, in her own behalf and as tutrix of their minor child, against the Great Southern Lumber Company, to recover damages for the alleged unlawful killing of her husband. She had a verdict and judgment. 13 F. (2d) 246. The Circuit Court of Appeals reversed the judgment, and remanded the case for a new trial. 17 F. (2d) 468.

The Lumber Company operated a sawmill in the city of Bogalusa, Louisiana, in which it employed about 2,500 men, white and colored. The sawmill was conducted as an "open shop," and although union laborers were employed individually, the Company did not deal with the union itself. Williams was president of the local union.

The complaint alleged that a conspiracy had been formed between the Company, its officers, agents and others to kill Williams and destroy organized labor in the city, and that he was killed without just cause by a mob composed largely of officers, agents and employees of the Company acting within the scope of their employment. The Company denied this, and alleged that he was killed by a posse of peace officers of the city while he was unlawfully resisting them in attempting to serve warrants issued for the arrest of certain other persons.

The Circuit Court of Appeals, while stating that there was no direct evidence of the alleged conspiracy, did not pass upon the question whether the trial court had erred in denying the Company's request for a directed verdict, but reversed the judgment on the grounds of error in de-

clining to permit the introduction of certain evidence offered by the Company, and in admitting certain evidence of the plaintiff.

The petitioner contends that these rulings of the trial court were correct; and that, even if erroneous, they were technical errors which did not affect the substantial rights of the Company or constitute grounds of reversal.

For the purpose of determining these contentions it suffices to say that there was substantial evidence showing or tending to show the following facts: For some time there had been much disturbance in the city, arising apparently out of friction between the labor union and the Company as to its open shop policy, and an effort to unionize the colored laborers. On one occasion mill-wrights brought to the city to repair broken machinery which had caused the mill to shut down, had been forced to re-enter the train and leave the city. On another, certain laborers had been put in jail and a crowd of their sympathizers, some of whom were armed, had threatened a jail delivery. On another, the light and water plant, supplied by power from the Company's plant, had been forced to shut down temporarily. And frequently there had been disorders at meetings of the city commission. The general condition finally became so threatening to the public peace and safety that a number of business and professional men organized a League—to which no union members or persons connected with the Company were admitted—for the purpose of assisting the city authorities in maintaining law and order, and offered their services to the city as volunteer police to serve when occasion might require. On the advice of the city judge and attorney and the State district judge, this offer was accepted, and many members of the League were sworn in as such special police. The Commissioner of Public Safety and the Chief of Police also arranged with the manager of the Company that when so requested a siren whistle at the mill, which

had been customarily used as a fire alarm, should be sounded to summon the volunteer police. And on the occasion of the threatened jail delivery the volunteer police had been thus summoned and had caused the dispersal of the mob.

For some weeks immediately prior to the killing of Williams there had been a shut-down of the mill due to the breakage of machinery and conditions in the city had quieted.

In this state of affairs, on the day before Williams was killed, a city warrant was issued, on the complaint of a merchant who was a member of the volunteer police, against one Dacus, a colored man, on the charge of being a dangerous and suspicious character. Just what had been the connection of Dacus, if any, with the labor troubles does not clearly appear. On that day Dacus could not be found, and was not arrested. On the next day, however, he appeared on the streets of the city in company with two white men, O'Rourke and Bouchillon, associates of Williams in the labor union, who were armed with shot guns. The three together walked along the main street of the city, causing excitement among the bystanders, and entered upon the premises upon which Williams had his office and residence. A policeman who saw them immediately informed the Chief of Police of what had occurred. The court, however, did not permit the policeman to testify as to the language used by O'Rourke and Bouchillon, which he reported to the Chief of Police; nor the Chief of Police to testify as to the language thus reported to him. The Chief of Police, who was also informed of this occurrence by other citizens, obtained a city warrant for the arrest of O'Rourke and Bouchillon on the charge of disturbing the public peace, which, with the warrant for Dacus, was given to a paid police officer for service. Both the Chief of Police and the Commissioner of Public Safety, with whom he conferred, were of

opinion that in view of the existing conditions and the reported conduct of O'Rourke and Bouchillon, it was advisable, in view of the small number of paid police available, that the officer to whom the warrants were given should be accompanied by the Commissioner of Public Safety and by the volunteer police. At their request the Superintendent caused the siren whistle to be sounded, and many of the volunteer police assembled at the city hall. A posse consisting of the paid policeman with these volunteer police, headed by the Commissioner of Public Safety, then proceeded to Williams' office for the purpose of making the arrests. They were also accompanied or followed by several other people—some of whom were officers or employees of the Company—who had not been summoned as members of the posse.

There was a direct conflict in the evidence as to what occurred when the posse reached Williams' office; some of the witnesses testifying to the effect that Williams and others in the office were killed by members of the party, without warning or provocation; and others testifying that Williams, who was standing at the door of the office, was notified that the purpose of the visit was to serve warrants on Dacus, O'Rourke and Bouchillon, and called upon to put down a pistol held by him and permit the arrests to be made, which he refused to do; and that a shot was then fired from the inside of the office, and this was followed by a fusillade from outside and inside the office, in which Williams was killed, and others, including O'Rourke and Bouchillon, were killed or wounded.

1. The Company should have been permitted to show the language that was used by O'Rourke and Bouchillon and communicated to the Chief of Police. The offer of proof was to the effect that, as communicated to the Chief of Police, O'Rourke and Bouchillon while walking down the streets with shotguns, with Dacus between them,

said—using vile and opprobrious epithets—that they would like to see any white man who would come and take Dacus away, or the eye of any white man who would touch him. This plainly indicated a purpose to prevent by force the arrest of Dacus, and was a breach of the peace. A crucial issue in the case was whether the party that killed Williams was a mob, acting in concert with the Company, which had gone to his office for the purpose of killing him; or whether it was a bona fide posse of peace officers sent by the Chief of Police and the Commissioner of Public Safety to aid the officer in making the arrests. On this issue it was of prime importance to the Company to show the reason which the Chief of Police and the Commissioner of Public Safety had for sending the posse of voluntary police to assist in making the arrest, and not leave the bona fide nature of the posse— which was directly brought in issue—to depend merely upon the expression of their opinion without a full showing of the facts upon which that opinion was based. This was emphasized by the fact that while the district judge did not permit evidence of the threatening language used by O'Rourke and Bouchillon to go to the jury, he charged them that a citizen carrying arms publicly on the street committed no offense and was not subject to arrest; thus leaving the jury to infer that the conduct of O'Rourke and Bouchillon, unaccompanied by any evidence of threatening language, was entirely lawful, and not a justification for issuing the warrants against them or sending the posse of voluntary police to assist in the arrests. The exclusion of evidence as to the threatening language obviously prevented the Company from presenting its full and complete defense to the jury.

2. The district court also permitted the plaintiff, over the objection of the Company, to testify that about ten or fifteen minutes after her husband had been killed and

the last shot had been fired, she heard one Carson, a member of the volunteer police force, say that " they had come to kill Lem Williams, and they had killed him." There was a direct conflict in the evidence as to whether Carson had been with the party at the time Williams was killed; the weight of the evidence being to the effect that he had been sent to another part of the city and had arrived after the killing. But, however this may be, the statement made by him as to the purpose the party had in coming, made after the killing had taken place and when the conspiracy, if one had existed, had accomplished its purpose, was hearsay, not part of the *res gestae,* and not admissible against the Company.

3. The judgment was properly reversed on account of these errors. This was not affected by the provision of § 269 of the Judicial Code, as amended in 1919,[1] that in an appellate proceeding judgment shall be given after the examination of the entire record, " without regard to technical errors, defects or exceptions which do not affect the substantial rights of the parties." The errors in the exclusion and admission of evidence directly affected the substantial rights of the Company. Since the passage of this Act, as well as before, an error which relates, not to merely formal or technical matters, but to the substantial rights of the parties " is to be held a ground for reversal, unless it appears from the whole record that it was harmless and did not prejudice the rights of the complaining party." *United States* v. *River Rouge Co.,* 269 U. S. 411, 421. Here it cannot be said from the entire record that the errors were harmless; but on the contrary they were material and of a highly prejudicial character.

*Judgment affirmed.*

---

[1] 40 Stat. 1181, c. 48; U. S. C., Tit. 28, § 391.