UNITED STATES v. PEACH MOUNTAIN COAL MIN. CO. et al.

No. 119, Docket 20398.

Circuit Court of Appeals, Second Circuit.

April 18, 1947.

CLARK, Circuit Judge, dissenting.

Saul Godwin, of New York City (Saul Godwin and Paul S. Lipson, both of New York City, of counsel), for appellants.

J. Vincent Keogh, U. S. Atty., of New York City, and Thomas J. O'Brien, Gen. Counsel for Solid Fuels Administration, and Frederic Richmond, Asst. Gen. Counsel for Solid Fuels Administration, both of Washington, D. C. (Vine H. Smith and

Edward S. Szukelewicz, Asst. U. S. Attys., both of Brooklyn, N. Y., of counsel), for appellee.

Before SWAN, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

The appellants are a Pennsylvania corporation which had its principal place of business at Pottsville, in the County of Schuylkill, in that state and was during all the time here relevant a wholesaler of anthracite coal, and its secretary, Ben Stein, who acted for it in making carload shipments of that commodity to a retail dealer in such coal in Brooklyn, N. Y., named Galumbeck, who did business under the trade name of Flatbush Coal and Oil Company.

They were convicted and sentenced in the District Court for the Eastern District of New York after trial by court, a jury having been waived, on all but one count, of an indictment in 69 counts, each of which charged the unlawful sale and delivery to Galumbeck of a carload of anthracite coal in violation of the provisions of the Act of June 28, 1940, 54 Stat. 676, as amended by the Act of May 31, 1941, 55 Stat. 236, as amended by the Second War Powers Act, 50 U.S.C.A.Appendix, § 633; and in violation of Regulation No. 28 promulgated by the Solid Fuels Administration for War under the authority conferred upon the President by the above statutes and duly delegated by him to the SFAW which will be used herein to designate the Solid Fuels Administration for War. The trial on this information was consolidated with that on an information filed against Galumbeck charging him with unlawfully receiving the coal and he was also convicted and sentenced but has not appealed.

The appellants demurred to the information on the grounds that each count was insufficient to state a crime; that the statutes above mentioned were unconstitutional; and that the Reg. No. 28 was arbitrary, confiscatory and void. The overruling of their demurrer is now relied on for the reversal of the judgment and that part of the appeal will be disposed of first.

We have already decided that the delegation of power to the President under the Second War Powers Act was lawful. United States v. Randall, 2 Cir., 140 F.2d 70. The subsequent delegation of power by the President to SFAW was equally so and the promulgation of Reg. 28 was, beyond any fair doubt, a proper exercise of that delegated power in form and scope. See, Gallagher's Steak House v. Bowles, 2 Cir., 142 F.2d 530; L. P. Steuart & Bros. v. Bowles, 322 U.S. 398, 64 S.Ct. 1097, 88 L.Ed. 1350.

Each count of the information, as amended (and the amendment to allege that the coal was produced in Pennsylvania was properly allowed under Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. following section 687), gave the appellants to understand with reasonable certainty just what they had done which was alleged to be unlawful and that complied with Rule 7(c) of the above. They could have moved under Rule 7(f) for a bill of particulars had they been in doubt. See United States v. Wodiska, 2 Cir., 147 F.2d 38; United States v. Achtner, 2 Cir., 144 F.2d 49; United States v. Hess, 124 U.S. 483, 8 S.Ct. 571, 31 L.Ed. 516.

The contention that the information was bad because it did not allege negatively that certain exceptions in the regulations were not pertinent is also without merit since those exceptions play no part in defining the offense. United States v. Cook, 17 Wall. 168, 84 U.S. 168, 21 L.Ed. 538; Anderson v. United States, 2 Cir., 294 F. 593.

However the record shows that evidence persistently offered by the appellant to prove the circumstances under which they sold and delivered the coal was excluded by the court and that was reversible error since it prevented them from showing, as they insisted they could, that their conduct was not in violation of Regulation No. 28 because it was authorized by § 602.-761 thereof.

Sec. 602.761, in so far as it is presently pertinent provides that "(a) * * * each wholesaler, shall, to the maximum extent practicable, arrange with another wholesaler of his own selection * * * for regular distribution each month of all his excess tonnage to or for the account

**478**

of such wholesaler or wholesalers. * * *" To understand the applicability of the above quotation it is necessary to know something of the way the trial was conducted and something about the history of Regulation No. 28.

There was a pre-trial conference at which the trial judge and attorneys for the parties came to some understanding as to the issues and the facts which were conceded but the record fails to show clearly just what agreement was reached and at the subsequent trial there was some confusion on that score. The government called no witness before it rested upon the concession of the appellants, as stated by the court, that, "We have it now stipulated that the coal mentioned in the information was shipped on the cars numbered and that the shipments were from Pennsylvania to New York by the Peach Mountain Coal Mining Company and Ben Stein acting in their behalf in making the shipments, and the shipments were made to defendant Galumbeck," and upon the further concession "that Bennie Galumbeck, doing business as the Flatbush Coal and Oil Company, did not have an established base period tonnage with Peach Mountain Coal Mining Company and Ben Stein" which was made by the attorney for the appellants, "Only with this reservation. The reservation is that the coal charged in this information was not sent on Peach Mountain's base period * * *." After all the motions previously made had been renewed and overruled together with a motion for acquittal, the government was permitted to reopen its case and prove by one witness that in the anthracite coal business the terms "nut" and "chestnut" are synonymous.

The appellants and Galumbeck then introduced some evidence to show the circumstances under which the coal was shipped to the latter. Just what that was need not be stated more in detail than that it was a part of the appellants' attempt to prove that the Peach Mountain Coal Mining Company had available coal in excess of it requirements to satisfy its obligations under Reg. 28 to its own base period customers and had arranged in accordance with § 602.761 with two other wholesalers, viz.: McCann Coal Company and Louis Gulotta & Company, each of which did have a base period experience with Galumbeck and were short of coal to distribute to him, to ship the coal covered by the information to Galumbeck for the account of those two wholesalers. The substance of what was excluded is sufficiently shown by the following offers of proof made by the attorney for the appellants as follows:

"Here is what I offer to prove: that this wholesaler, the McCann Company, having a base period with the Flatbush Coal & Oil Company, were authorized under that base period to send him 80 per cent of the coal they had delivered during the base period. Now, when that particular wholesaler did not have sufficient coal to supply the retailer in Flatbush, he transferred, or permitted Ben Stein, the other wholesaler, to ship on his base period, to supply on his base period to the retailer the coal that he is deficient on. It is a perfectly legal transaction. Nobody is getting more coal. Nobody is overcharging and it is a shipment on a base period substituting one period—no, that is an inept expression—it is a loan of the coal by Peach Mountain to McCann and shipped under McCann's name and under Gulotta's name on their base periods." After the offer was excluded the attorney added, "I have in addition to the McCann Coal Company, Gulotta of the Louis Gulotta Coal Company, and I offer to prove by him that he authorized Ben Stein to ship, as the railroad man testified, to ship in his name, the coal to the Flatbush on Gulotta's base period, the same as McCann did." This was then excluded and the ruling was adhered to throughout the remainder of the trial.

The relevancy of the offered evidence and the seriousness of the error in its exclusion becomes apparent when the purpose and background of § 602.761 is understood. Regulation 28 as a whole had been promulgated by the SFAW after it had been duly established that a shortage of anthracite coal required the enforcement of a regulated method of distribution to insure, so far as possible, an equitable allocation of what remained after governmental requirements were satisfied. It was the successor of both SFAW revised Regulation No. 2 which expired on March 31, 1944 and had

provided for the distribution by SFAW itself of what was known as excess tonnage after it had been reported by wholesalers having an excess of coal; and of SFAW Regulation No. 18 which had somewhat altered the method for making excess tonnage available for civilian use, following the expiration of Regulation No. 2. Regulation No. 18 had provided that producers and wholesalers should, "to the maximum extent practicable, arrange with another producer or wholesaler of his own selection * * * for regular shipment each month to or for the account of such producer or wholesaler of all anthracite which exceeds the tonnage actually shipped or scheduled for shipment during the month * * *." It had further provided that if a producer or wholesaler having excess tonnage was unable so to dispose of it during the month and the SFAW did not direct its distribution within thirty days after report to it the producer or wholesaler might then distribute it as he chose. Regulation No. 18 expired on March 31, 1945.

On March 14, 1945, Regulation No. 28 was issued to take effect on April 1, 1945 and was in effect during the relevant period on this appeal. As stated in § 602.750 it was "designed to assure that each producer and each wholesaler of Pennsylvania anthracite arranges his distribution schedules so that each destination and the consumers therein will receive a fair share of available anthracite through normal sources of supply so far as practicable." The base period of Regulation No. 18 was retained with exceptions not here material. The maximum lawful tonnage distributable to retailers with whom a producer or wholesaler had a base period was 80 per cent and discrimination was forbidden. Among the numerous definitions of terms, "distribution" was defined to mean "shipment, delivery, sale or other disposal" and distribution by producers and wholesalers to their retail dealers was required in regular equal monthly shipments to the maximum extent practicable. Reports to the SFAW of shipments were to be made to enable the latter to publish monthly a statement of percentages supplied the preceding month by each producer or wholesaler. The problem of excess tonnage was dealt with in §

602.761 much as it had been in Regulation No. 18 but if a producer or wholesaler having excess tonnage was unable to dispose of it, though the SFAW might within thirty days direct its disposition, the excess could not be distributed free of regulation if the SFAW did not direct its disposal.

The obvious purpose of § 602.761 was to prevent unnecessary accumulations of coal, called excess tonnage, in the hands of producers and wholesalers and thereby needlessly increase the inevitable shortage to consumers. And it is quite as evident that the purpose was to dispose of the coal, so far as practicable, through normal sources of supply as § 607.751 indicated and § 602.761 provides.

The appellants were frustrated by the exclusion of the offered evidence in their attempt to show that they had not violated Regulation No. 28 in their distribution of the coal to Galumbeck.

The excluded proof was relevant on that subject. Proof has to be introduced in a trial step by step. Because the attempt to show compliance with § 602.761 was nipped in the bud, so to speak, we have no means of knowing whether it would have appeared in full flower had the trial been without error. It is enough for present purposes that the error in excluding the offered evidence prevented the appellants from presenting their defense in full. They were unable to take such advantage of the provisions of the above section as proof of a compliance with it would have entitled them and that requires a new trial. Williams v. Great Southern Lumber Co., 277 U.S. 19, 48 S.Ct. 417, 72 L.Ed. 761.

Judgment reversed and cause remanded for a new trial.

CLARK, Circuit Judge (dissenting).

I regret that our decision herein does not settle, or appear even to consider, the important issue of law presented as to the interpretation of this regulation for the fairer allocation of anthracite coal in wartime. Indeed, I fear that our result may only embarrass the new trial which must be conducted somewhat in the dark. The issue concerns the meaning of the words found in SFAW Reg. 28, § 602.761, 30 CFR, 1945 Supp., § 602.761, granting per-

mission to wholesalers to arrange with other wholesalers for distribution of their excess tonnage each month "to or for the account of such wholesaler or wholesalers." And the crucial question here is whether the wholesaler with excess quota over the tonnage on hand could simply direct supply to his customer by another wholesaler or producer, dropping out of the picture so far as any further responsibility for the shipments was concerned, or whether the coal must be still shipped for the first wholesaler's account and on his *responsibility*, so far as the customer was concerned. Here the wholesalers McCann Co. and Gulotta attempted to transfer their quota for the retailer Galumbeck to appellants, but they dropped out completely so that appellants had to look to Galumbeck to carry through the purchase and to make payment therefor. Since this crucial fact was shown by appellants' own evidence and in fact was thoroughly conceded, appellants' offer of proof, discussed in the opinion, must be construed accordingly. As it did not assume to show compliance with the regulation on the stricter interpretation, as claimed by the United States, the offer was properly rejected if that interpretation was correct.

I believe that it was and that the transactions did not conform to the purpose of the regulation or to its expressed requirement. They were thus banned by § 602.752, prohibiting distribution of regulated coal unless expressly authorized by the regulation. Here, as we have seen, appellants do not claim that they shipped coal to the McCann Co. or to Gulotta directly, only that they made the shipments to Galumbeck "for the account of" these wholesalers. But under any proper use of these words this cannot be so. In business parlance, as well as in law, a shipment by X for the account of Y is one in which X looks to Y for payment. If Z is the consignee he remits to Y. No financial relationship exists between X and Z. 2 Williston on Sales, 2d Ed. 1924, § 525, p. 1336; Vold on Sales, 1931, p. 254. As appellants' witness McCann testified, payment for the shipments on Galumbeck's quota with his company went directly from Galumbeck to appellants. His company neither received nor paid out any money. Thus his company's accounts with Galumbeck and with appellants remained completely unaffected. These shipments were therefore not sales for the account of the wholesaler McCann Co., but outright direct sales from appellants to retailer Galumbeck, and hence illegal non-quota shipments.

The purpose of the regulation as expressed in § 602.750 was to insure a fair distribution of anthracite coal to consumers through normal sources of supply, so far as practicable. Transactions such as those at bar, if legal, would constitute methods whereby wholesalers with excess coal could bypass other wholesalers having supply difficulties and establish business relationships with the customers these wholesalers would otherwise normally supply. Because of their lack of marketable coal, short-supplied wholesalers would be powerless to resist this loss of profits and business good will. It is difficult to believe that § 602.761 was drawn to sanction such war profiteering.

The transactions at bar subvert the purpose of the regulation in a more important and fundamental respect, however. Sec. 602.764 required wholesalers having less coal than their retail outlets were entitled to receive, to distribute their coal on a percentage basis without discrimination among retailers. Here appellants, not the McCann Co. and Gulotta, made the decision as to how much coal was to be shipped to Galumbeck. By shipping more or less coal to Galumbeck, appellants could vary the percentage of his quota which he actually received. But only the McCann Co. and Gulotta knew the relationship between the percentage which Galumbeck had already received to the percentages with which they had supplied their various other customers. Therefore appellants were unable, even had they so desired, to equalize the percentages. These transactions therefore inevitably produced the inequality and inequity of distribution which the regulation was designed to prevent.

There is a further point involved in this appeal, since as to certain extensive shipments covered by separate counts of the information, there is not even the defense of a transferred quota of the kind just discussed. The McCann Co. authorized appellants to ship 318 tons of domestic sizes

of coal to Galumbeck during the two months' period covered by the information. During this period appellants actually shipped 880 tons of domestic sizes to Galumbeck purportedly on his quota with the McCann Co. Possibly this quantity may not have been in excess of Galumbeck's unfilled year's quota. But we have neither knowledge of nor purpose in discovering what shipments appellants made to Galumbeck at other periods not covered by the information. Moreover, § 602.761 prescribes disposal of excess tonnage on a monthly basis "to the maximum extent practicable." The qualification in this section involving practicability was apparently intended to cover shipments dated as of a particular month just before it had begun or just after it had ended. Certainly it cannot be held to excuse an overage of 175% in shipments over a two months' period. Appellants introduced in evidence documents describing all shipments made under both of the purportedly transferred quotas. From these documents the shipments purportedly made on the McCann Co.'s quota after 318 tons had already been shipped can be ascertained. These shipments were unquestionably over the quota and violative of the regulation. The convictions under counts alleging them should be affirmed, notwithstanding our sub silentio decision against the government on the legal issue as to the regulation's meaning.